**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN IMMIGRATION COUNCIL,

*Plaintiff,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY PRIVACY OFFICE; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT,

*Defendants*.

Case No. 20-cv-01196-TFH

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION**

Claudia Valenzuela (D.C. Bar No. IL0056)
Emily Creighton (D.C. Bar No: 1009922)
AMERICAN IMMIGRATION COUNCIL
1331 G St. NW, Suite 200
Washington, DC 20005
(202) 507-7540
(202) 742-5619 (fax)

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..............................................................................................ii-iv

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

LEGAL STANDARD.......................................................................................................9

ARGUMENT ................................................................................................................10

I.      Plaintiff Is Likely To Prevail On The Merits....................................................10

II.     Plaintiff Faces Irreparable Harm ...................................................................14

III.    The Balance Of Equities Favors A Preliminary Injunction. ............................17

IV.     The Public Interest Favors An Injunction. ......................................................18

CONCLUSION.............................................................................................................19

# TABLE OF AUTHORITIES

**PAGE(S)**

## <u>Cases</u>

*Aguilera v. FBI,* 941 F.Supp. 144 (D.D.C.1996) ...................................................... 9, 12

*American Oversight v. U.S. Department of State,* 414 F.Supp.3d 182 (D.D.C. 2019).......... *passim*

*Archdiocese of Washington v. Washington Metropolitan Area Transit Authority,* 897 F.3d 314

    (D.C. Cir. 2018) ................................................................................................ 10

*Citizens for Responsibility and Ethics in Washington v. Federal Election Com'n*, 711 F.3d 180

    (D.C. Cir. 2013) ................................................................................................ 11

*Cleaver v. Kelley,* 427 F.Supp. 80 (D.D.C.1976) .................................................... 9, 12

*Clemente v. Fed. Bureau of Investigation*, 71 F.Supp.3d 262 (D.D.C. 2014) .............................. 12

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96 (D.D.C.

    2017) ............................................................................................................. 17

*Edmonds v. F.B.I.*, 417 F.3d 1319 (D.C. Cir. 2005) ..................................................... 10

*Electronic Privacy Information Center v. Dep't of Justice*, 416 F.Supp.2d 30 (D.D.C. 2006)

    (*EPIC*) ...................................................................................................... *passim*

*EPA v. Mink*, 410 U.S. 73 (1973) ........................................................................... 14

*Grace v. Whitaker,* 344 F.Supp.3d 96 (D.D.C. 2018)................................................... 10

*Jacksonville Port Auth. v. Adams.,* 556 F.2d 52 (D.C.Cir.1977)................................... 19

*Judicial Watch, Inc. v. United States Department of Homeland Security*, 895 F.3d 770 (D.C. Cir.

    2018) ............................................................................................................. 12

*Landmark Legal Foundation v. E.P.A.*, 910 F.Supp.2d 270 (D.D.C. 2012)................................ 12

*Leadership Conference on Civil Rights v. Gonzales*, 404 F.Supp.2d 246 (D.D.C. 2005)............ 13

*Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004) ................................ 18

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) .................................................. 14

*Payne Enterprises, Inc. v. United States et al.,* 837 F.2d 486 (D.C. Cir. 1988) ..................... 9. 15

*Protect Democracy Project, Inc. v. U.S. Department of Defense,* 263 F.Supp.3d 293 (D.D.C. 2017) ................................................................................................................. *passim*

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974) ............................................... 9

*Sai v. Transportation Security Administration*, 54 F.Supp.3d 5 (D.D.C. 2014) .......................... 15

*Seavey v. Department of Justice,* 266 F.Supp.3d 24 (D.D.C. 2017) ...................................... 11, 16

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) .................................................................... 10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77 (D.D.C. 2017) ............................................................................................................................ 10

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ........................................................ 11

*United States Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749 (1989) ......................................................................................................... 14

*Washington Post v. Department of Homeland Sec.*, 459 F.Supp.2d 61 (2006) ............ 11,12,15,18

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ............................................................ 9

## Statutes

5 U.S.C. § 552(a)(3)(A) ................................................................................................................ 11

5 U.S.C. § 552(a)(4)(A)(viii)(II)(aa) ........................................................................................... 10

5 U.S.C. § 552(a)(4)(B) ............................................................................................................... 10

5 U.S.C. § 552(a)(6)(E)(i) ................................................................................................. 2, 9, 10, 17

5 U.S.C. § 552(a)(6)(E)(iii) ..................................................................................................... 11, 17

5 U.S.C. § 552(f)(2) ..................................................................................................................... 11

8 U.S.C. § 1229a(b)(4) .................................................................................................................. 4

Freedom of Information Act, Pub. L. No. 93-502, 88 Stat. 1561 (1974) ..................................... 14

## **<u>Regulations</u>**

6 C.F.R. § 5.5(e)................................................................................................... 2, 9, 17

## INTRODUCTION

On March 19, 2020, Plaintiff American Immigration Council ("Council") filed a Freedom of Information Act (FOIA) request with Defendant U.S. Immigration and Customs Enforcement (ICE) seeking records that shed light on how the agency is addressing the COVID-19 pandemic and its impact on the individuals in its custody. *See* Dkt. 1, Ex. A. Plaintiff's FOIA request seeks the production of records, including data, relating to the criteria for release of individuals from ICE custody, the communication access to counsel and family afforded to detained individuals, training for subcontractors and staff on a COVID-19 response, and the availability of medical care, including screening, testing, treatment and housing for individuals who are at risk or test positive for COVID-19 and remain detained. *Id*.

Plaintiff seeks this information both to assist on-the-ground efforts on behalf of detained immigrants and to ensure real-time public accountability over ICE. The records Plaintiff seeks from Defendants will advance the day-to-day work of its Immigrant Justice Campaign ("Justice Campaign"), an initiative that provides detained immigrants with access to *pro bono* counsel and advocates for meaningful reform in the immigration detention system. At present, there is an urgent need for documents that shed light on how counsel and advocates working with detained immigrants can pursue the release of individuals at-risk for contracting COVID-19 or otherwise understand the medical treatment, housing and access to communication provided within ICE detention centers for those who remain detained. The information that ICE has released publicly is limited and has generated more questions.

Further, Plaintiff's organizational mission encompasses holding immigration agencies accountable through the pursuit of transparency and impact litigation as well as providing information to the public to influence policymaking in the United States. Oversight of immigration detention is critical during the COVID-19 pandemic given Defendant ICE's well-documented

history of providing substandard medical care and restricted access to due process to the thousands of men, women, and children in its custody. The fast-moving and life-threatening nature of the COVID-19 pandemic, particularly in jails and prisons, makes the timely release of information especially urgent.

Plaintiff filed it FOIA request with Defendant ICE on March 19, 2020. Due to the pressing need for information about ICE's response to the COVID-19 pandemic, Plaintiff also sought expedited processing of its FOIA request. *See* 5 U.S.C. § 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e). On April 6, 2020, Defendant ICE transferred the request to Defendant DHS. DHS acknowledged receipt of Plaintiff's transferred request in an April 8, 2020 letter and additionally granted Plaintiff's request for expedited treatment. *See* Dkt. 1, Ex. C. To date, neither Defendant has provided a further response nor begun production of responsive records. Plaintiff has separately filed a complaint challenging Defendants' failure to make a timely determination or produce responsive records. Dkt. 1.

Plaintiff now respectfully moves for a preliminary injunction and asks the Court to order that Defendants produce responsive, non-exempt records within 30 business days of this Court's order, or by a date deemed appropriate by the Court.

## BACKGROUND

*The COVID-19 Pandemic*

The COVID-19 virus outbreak, officially classified as a pandemic by the World Health Organization ("WHO"), Creighton Decl. ¶10, has affected nearly every sector of U.S.— and global—life. The virus spreads from person to person through droplets emitted when coughing, sneezing, or simply speaking. Creighton Decl. ¶11. Once the virus is released, it can live on surfaces for hours or days, depending on the surface, and infection can occur by touching these surfaces. *Id*. Some individuals who contract COVID-19 may remain asymptomatic, yet still

2

transmit the virus to others. Creighton Decl. ¶12. Individuals who contract the virus can develop severe flu-like symptoms, which can rapidly evolve into respiratory failure, requiring the need for a ventilator and other medical intervention. Creighton Decl. *Id*. Approximately one out of every five people who contracts COVID-19 will become very ill and eventually have difficulty breathing. *Id*. The virus's impact can have deadly consequences for individuals of advanced age or with certain underlying health conditions such as respiratory complications, diabetes, and heart disease. Creighton Decl. ¶14. Among all hospitalized patients, approximately 26% to 32% were admitted to the Intensive Care Unit ("ICU"). ¶12. Different studies place mortality rates of those who enter the ICU between 39% and 72%. Creighton Decl. *Id*.

The Centers for Disease Control and Prevention ("CDC") has stated that "social distancing" is crucial to avoid the spread of the virus. Creighton Decl. ¶16. In response, a majority of states issued "shelter-in-place" orders to the general public, adhering to expert medical guidance that these orders are necessary to effectively practice social distancing and thus contain the virus's deadly spread. Creighton Decl. ¶18. Even in U.S. cities and states that have not issued such orders or have decided not to extend them, stringent protocols remain in place. Creighton Decl. ¶18. In addition to social distancing, which entails limiting crowd sizes, these also include wearing face masks in public and stringent sanitization of facilities. *Id*. According to reports, as of May 11, 2020, 79,552 deaths in the United States have been attributed to COVID-19. Creighton Decl. ¶15.

*The Immigration and Customs Enforcement (ICE) Detention System*

Defendant ICE is tasked with overseeing the U.S. immigration detention system, which is comprised of hundreds of prisons and jails throughout the country. On any given day, ICE detains thousands of men, women, and children in these facilities. ICE's capacity to detain

individuals has exploded over the years, "growing more than twentyfold since 1979." Creighton Decl. ¶20. Just prior to the COVID 19 outbreak. ICE detained an all-time high of over 54,000 people in its custody. *Id*. ICE operates its vast detention system by way of a patchwork of contracts with for-profit corporations, local and state governments, and the U.S. Marshals, which are subject to differing standards of compliance. Creighton Decl. ¶21.

Given the operational complexity of ICE's detention system, dictated by an assortment of contracts which vary in their obligations, it is no surprise that ICE's oversight of this system has been widely critiqued as inefficient, non-transparent and even negligent. Creighton Decl. ¶21-23. In 2018, DHS's Office of Inspector General issued a report noting that ICE inspections of its facilities were inadequate in key aspects, rendering them ineffective in identifying and correcting conditions issues and ensuring consistent compliance with governing detention standards. Creighton Decl. ¶21. As a result, the OIG concluded that ICE inspections, "...do not ensure adequate oversight or systemic improvements in detention conditions, [with] certain deficiencies remain[ing] unaddressed for years." *Id*. Perhaps most troubling, Defendant ICE has a track record of failing to provide adequate medical care to individuals in its custody, which has already resulted in countless preventable deaths to date. Creighton Decl. ¶23.

Defendant ICE also has long resisted providing detained individuals with meaningful access to counsel. Creighton Decl. ¶24. This access is crucial because individuals facing removal from the United States do not have a right to court-appointed counsel and must secure legal assistance or represent themselves. 8 U.S.C. § 1229a(b)(4). According to one national study, the chance that an immigrant would obtain relief from deportation is five-and-a-half times greater if they are represented by an attorney. Creighton Decl. ¶24. Though communication with an attorney and family members is critical to a detained individual's chance of successfully

defending against deportation, phone access from ICE jails and prisons has often involved exorbitant costs and logistical difficulties. *Id*. Additionally, as ICE expands its immigration detention system, it increasingly targets prisons and jails in rural areas, where access to attorneys and other legal resources is difficult. Creighton Decl. ¶25.

*ICE's Response to the Pandemic*

A wide range of experts have noted that jails and prisons are particularly susceptible to widespread outbreaks because social distancing is not possible in these facilities. Creighton Decl. ¶26. Immigration detention is no exception.  Though ICE has released some individuals in its custody due to the outbreak, following public outcry and pressure, the release process has been non-transparent and haphazard, leading to questions about the integrity of this process. Creighton Decl. ¶27 One district court recently ordered ICE to conduct new assessments nationwide, finding that ICE's release procedures to date were problematic. *Id*. In the interim, thousands of men, women and children are at risk in ICE facilities, without individual control over social distancing and hygienic measures. Detained individuals have limited access to soap and often must pay for hand sanitizer. Creighton Decl. ¶28.  Face masks are difficult to obtain or simply unavailable. *Id*. The risk of the virus spreading to and within ICE detention centers is also exacerbated by the agency's practice of routinely transferring people from one detention center to another, often multiple times. Creighton Decl. ¶29. Under this system, ICE could inadvertently move asymptomatic carriers of the coronavirus among multiple detention centers, spreading the virus at each new location along the way. Creighton Decl. ¶30.

On March 19, 2020, doctors contracted by the Department of Homeland Security's Office of Civil Rights and Civil Liberties sent an open letter to Congress warning that ICE detention centers posed a "tinderbox scenario" for the spread of the coronavirus. Creighton Decl. ¶31.

These warnings were quickly realized when, on March 24, ICE announced the first case of coronavirus inside detention centers. Creighton Decl. ¶32. Since that time, the number of detained individuals infected with COVID-19 has increased at an alarming rate. On April 20, 2020, ICE confirmed 220 detained individuals at 28 different detention facilities and 30 ICE employees at 9 different detention facilities had tested positive for COVID-19. Dkt. 1 at ¶17. A little over a week later, on April 29, 2020, the number had doubled—425 individuals at 33 different detention facilities and 36 ICE employees at 12 different detention facilities has tested positive for COVID-19. *Id*. On May 5, 2020, ICE confirmed 674 individuals at 38 different detention facilities and 39 ICE employees at 13 different detention facilities have tested positive for COVID-19. *Id*. In approximately three weeks, the number of detained individuals in ICE facilities tripled. *Id*. On May 7, 2020, ICE reported the first COVID-19-relateddeath: Carlos Escobar-Mejia, a 57-year old man from El Salvador. Creighton Dec. ¶32.

A recent study on the potential impact of COVID-19 in immigration detention facilities underscores the urgent need for information. Creighton Decl. ¶33. The experts conducting the study considered three scenarios of COVID-19 infection based on the number of individuals in ICE custody as of March 2, 2020. *Id*. The scenarios were categorized as "optimistic, moderate and pessimistic" and projected the spread of COVID-19 over three potential periods-30, 60 and 90 days. *Id*. The conclusions are startling. In the most optimistic scenario, 72% of individuals in ICE custody will be infected on day 90, that is, by June 2, 2020. Moreover, "in the most optimistic scenario, coronavirus outbreaks among a minimum of 66 ICE facilities (59%) would overwhelm ICU beds within a 10-mile radius and outbreaks among a minimum of 9 ICE facilities (8%) would overwhelm local ICU beds within a 50-mile radius over a 90-day period, provided every ICU bed were made available for sick detainees." *Id*. Defendant ICE's response

to the pandemic within its facilities thus has potential far-reaching repercussions for public health generally.

The information Defendant ICE has made available to the public is generalized, and in some cases, simply references materials produced by other agencies. Plaintiff requested more substantial information that ICE has not released publicly, including ICE's criteria for releasing vulnerable individuals, the numbers of individuals who test positive for COVID-19 who are not released and the treatment and housing plan for these individuals and others who remain in ICE custody. ICE has released only scant information about steps it has taken to prepare for the pandemic and to prevent the spread of the virus. Dkt. 1 at ¶19. For example, in a declaration filed in a recent lawsuit, Lindsay M. Vick, Deputy Assistant Director for Clinical Services and Medical Director of IHSC (ICE Health Service Corps), stated that ICE is following CDC guidance for testing but does not specify what guidance has been followed or what testing has taken place. *Id.*

For those individuals in ICE custody, ICE has not clarified what steps it is taking or can take—given the current configurations of detention facilities—to safely house symptomatic individuals. Dkt. 1 at ¶20. ICE's public statements have discussed housing individuals in in "a single cell, or as a group, depending on available space." *Id.* ICE's ability, or lack thereof, to provide appropriate housing for individuals who are at risk is a critical piece of information not currently available to the public and encompassed in Plaintiff's FOIA request.

In addition, ICE has not shared data with the public that would provide an accurate and reliable picture of its attempts to stem the spread of COVID-19 and treat detained individuals. Dkt. 1 at ¶21. The public does not have access to data that would shed light on the number of medical housing rooms available in all ICE facilities, the number of detained individuals who have been

placed in solitary confinement for COVID-19-related reasons, and the number of individuals who have been transferred to an external hospital center or urgent care facility to treat COVID-19. *Id.*

ICE's guidance for release of detained individuals, to the extent it exists, also is unclear. For example, ICE has publicly stated on its website that it has released over 900 individuals after evaluating their immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns. Creighton Decl. ¶22. However, ICE provides no additional information about how these factors are considered in making determinations about release. In addition, though the number of individuals who have contracted COVID-19 in ICE detention facilities has tripled since April 20, ICE does not provide updated numbers, if they exist, for additional individuals it has released since that date.

*Plaintiff's FOIA Request*

Against this backdrop, on March 19, 2020, Plaintiff filed its FOIA request to obtain records and data to fully understand Defendant ICE's preparation for and response to the COVID-19 pandemic. Plaintiff requested protocols and guidance relating to medical screening, monitoring, testing, treatment and criteria for release for individuals with COVID-19 or at risk of contracting the illness; the availability and type of housing for individuals who remain detained in ICE facilities who test positive for COVID-19; the availability of communication with family members and counsel; sanitization procedures for ICE detention facilities; information provided to released individuals regarding COVID-19; and communication and training provided to sub-contractors and staff on limiting COVID-19 exposure within ICE facilities. *See* Dkt. 1, Ex. A.

The request also sought data relating to the number of medical housing rooms available in ICE detention facilities; the number of detained individuals placed in alternate housing due to a lack of availability of medical housing units; the number of individuals who have been taken

for medical treatment outside of the facility; the number of detained individuals diagnosed with the COVID-19 virus. *Id.* Plaintiff also sought expedited processing of its FOIA request. *See* 5 U.S.C. § 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e).

On April 6, 2020. Defendant ICE sent Plaintiff a letter acknowledging receipt of the FOIA request as of April 3, 2020. *See* Dkt. 1, Ex. B. In that letter, Defendant ICE also notified Plaintiff that the response to the FOIA would be coordinated by the DHS Privacy Office. *Id.* On April 8, Defendant DHS sent Plaintiff a letter acknowledging receipt of Plaintiff's request as of April 7, 2020 and notifying Plaintiff that it had granted Plaintiff's request for expedited treatment. Dkt. 1, Ex. C. Plaintiff has received no further communications from the agencies since that time.

**LEGAL STANDARD**

Courts have repeatedly asserted their authority to consider motions for injunctive relief in FOIA actions. *See American Oversight v. U.S. Department of State,* 414 F.Supp.3d 182, 186 (D.D.C. 2019)*; Protect Democracy Project, Inc. v. U.S. Department of Defense,* 263 F.Supp.3d 293, 298 (D.D.C. 2017); *Electronic Privacy Information Center v. Dep't of Justice*, 416 F.Supp.2d 30, 35 (D.D.C. 2006) (*EPIC*); *Aguilera v. FBI,* 941 F.Supp. 144, 152–53 (D.D.C.1996)*; Cleaver v. Kelley,* 427 F.Supp. 80, 81–82 (D.D.C.1976). Moreover, "[t]he FOIA imposes no limits on courts' equitable powers in enforcing its terms." *Payne Enterprises, Inc. v. United States et al.,* 837 F.2d 486, 494 (D.C. Cir. 1988) (citing *Renegotiation Bd. v. Bannercraft Clothing Co*., 415 U.S. 1 (1974)).

In determining whether a preliminary injunction should issue, courts consider four factors: 1) the movant's likelihood of succeeding on the merits of the claim; 2) the irreparable harm that the movant faces; 3) whether the balance of equities weighs in the movant's favor; and 4) whether granting relief would further the public good. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *see also Archdiocese of Washington v. Washington Metropolitan Area Transit*

*Authority,* 897 F.3d 314, 321 (D.C. Cir. 2018) (citations omitted). The D.C. Circuit has not squarely decided the question of whether the sliding scale approach, under which "a strong showing on one factor could make up for a weaker showing on another," and which it had traditionally employed prior to *Winter*, survives. *Archdiocese of Washington v. Washington Metropolitan Area Transit Authority,* 897 F.3d at 334; *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77, 83 (D.D.C. 2017). This Court need not decide the question in this case, given that Plaintiff's motion roundly satisfies all four prongs of the test for injunctive relief. *See e.g. Grace v. Whitaker,* 344 F.Supp.3d 96, 145-46 (D.D.C. 2018); *see also Archdiocese* at 334.

## ARGUMENT

### I.    Plaintiff Is Likely to Prevail on The Merits.

The FOIA statute requires that an agency  make a determination on a FOIA request within twenty business days, unless the agency invokes an additional ten-day extension for requests involving "unusual circumstances." 5 U.S.C. § 552(a)(4)(A)(viii)(II)(aa). Recognizing that some circumstances would require the need for public information more quickly, Congress embedded an expedited process into this statutory scheme by which agencies must make determinations within ten business days. 5 U.S.C. § 552(a)(6)(E)(i); *see also Edmonds v. F.B.I.*, 417 F.3d 1319, 1324 (D.C. Cir. 2005). An agency's failure to comply with the statutory timeframe to make a determination means a requester has exhausted its administrative remedies and can directly seek review in federal district court. 5 U.S.C. § 552(a)(4)(B); *Protect Democracy Project, Inc.*, 263 F.Supp.3d at 301. Plaintiff has therefore exhausted its administrative remedies and now invokes the Court's justified intervention to order the production of records responsive to its request because of its exigent nature.

There can be no doubt that the documents that Plaintiff seeks are "agency records" for purposes of the FOIA statute.  5 U.S.C. § 552(f)(2); *see also U.S. Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 146 (1989) ("agency records" are documents "obtained" or "created" by an agency and within the agency's control)*; Washington Post v. Department of Homeland Sec*., 459 F.Supp.2d 61, 68 (2006). Plaintiff has described records that are instrumental in effectuating Defendant ICE's obligation to address the pandemic. The documents Plaintiff seeks—ICE guidance, policies, and data—by definition are created and maintained by ICE. ICE has already posted some information of this nature publicly, *see* Creighton Decl. ¶17, indicating the records that Plaintiff seeks exist and are within Defendants' control.

Defendants granted Plaintiff's request for expedited treatment over one month ago but have not produced the records "as soon as practicable," as required by statute. 5 U.S.C. § 552(a)(6)(E)(iii). For purposes of the prompt release of records under the non-expedited statutory timeframe, 5 U.S.C. § 552(a)(3)(A), the production of records must follow "…within days or a few weeks of a 'determination,' not months or years." *See Citizens for Responsibility and Ethics in Washington v. Federal Election Com'n*, 711 F.3d 180, 283 (D.C. Cir. 2013)*; Seavey v. Department of Justice,* 266 F.Supp.3d 241, 244 (D.D.C. 2017).  The timeframe for producing records on an expedited basis can be no less. *See EPIC*, 416 F. Supp. 2d at 39 (" . . . the phrase 'as soon as practicable,' in the context of a provision of FOIA allowing for *expedited* processing, cannot be interpreted to impose a lower burden on the agency than would otherwise exist") (emphasis in original). Defendants' failure to produce records to date, or "within days or a few weeks" from the time that they granted Plaintiff's request for expedited treatment means that they have not complied with the statute's mandate of processing requests either "promptly" or "as soon as practicable." *See Judicial Watch, Inc. v. United States Department of Homeland*

*Security*, 895 F.3d 770, 775-76 (D.C. Cir. 2018) ("Congress underscored the importance it attached to prompt responses by allowing judicial recourse, bypassing administrative exhaustion, if an agency fails to meet statutory timetables for disclosure or to justify… its delay in making non-exempt records available upon request.").

Injunctive relief ordering Defendants to make records available within thirty days of any order by the Court is warranted given the urgent nature of Plaintiff's request. *Landmark Legal Foundation v. E.P.A.*, 910 F.Supp.2d 270, 275 (D.D.C. 2012) ("…courts have equitable powers to order agencies to act within a particular time frame…"); *Clemente v. Fed. Bureau of Investigation*, 71 F.Supp.3d 262, 269 (D.D.C. 2014) (a court "may use its equitable powers to require the agency to process documents according to a court-imposed timeline."). Courts routinely give weight to the time-sensitive nature of the records requested when ordering agencies to produce records within designated deadlines. *See e.g.*, *American Oversight,* 414 F.Supp.3d at 187 (ordering communications relating to presidential impeachment query produced within approximately one month); *EPIC*, 416 F.Supp.2d at 43 (ordering  records to inform the ongoing national debate about the government's wireless surveillance program within one month); *Aguilera v. FBI,* 941 F.Supp. at 153 (ordering exculpatory FBI records in criminal proceeding within approximately one month); *Cleaver v. Kelley,* 427 F.Supp. 80, 81–82 (D.D.C.1976) (ordering production of FBI records within approximately twenty days. Without the Court's intervention, the expedited treatment that Defendants have granted Plaintiff's request may be rendered meaningless. *EPIC,* 416 F.Supp.2d at 37. Setting a court-imposed deadline to produce records implicating a matter of public urgency—ICE's response to the COIVD 19 pandemic in immigration detention centers—is therefore necessary in this case to effectuate Plaintiff's statutory right to expedited processing. *Id*. at 38; *Washington Post*, 459 F.Supp. at 75 (noting that in the absence of a preliminary injunction,

"plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request.").

Plaintiff seeks records that will help guide on-the-ground efforts that will directly impact detained immigrants and that will likely influence public discourse around ICE's handling of this unprecedented health crisis. *See e.g., Leadership Conference on Civil Rights v. Gonzales*, 404 F.Supp.2d 246, 260 (D.D.C. 2005) (ordering expedited processing and production of records by a date certain given the debate over voter suppression and intimidation "is paramount and expedition of these documents could advance the current debate over the Voting Rights Act."). Immigrants have the right to release where constitutionally warranted, and those who remain detained have well-established rights to due process rights and medical treatment. Reliable and accurate information about Defendant ICE's release criteria, as well as management of its detention facilities in the current climate is crucial to effectuate public action and oversight to ensure that these rights are protected. *Protect Democracy Project, Inc.*, 263 F.Supp.3d at 300 (recognizing the harm of further potentially unlawful airstrikes over Syria if records not timely released, noting that "[b]y then, any damage will have been done.").  Plaintiff has the demonstrated ability to widely disseminate information to a broad audience, including attorneys, advocates, and policymakers, with the aim of impacting action on the ground in detention centers as well as pressure for accountability over Defendant ICE's treatment of the thousands of individuals in its custody. Ordering production by a date certain here is essential in effectuating Plaintiff's right to expedited processing under the statute and its goal of informing the public in a timely manner about an issue of urgent concern. *American Oversight,* 414 F.Supp.3d at 186; *EPIC*, 416 F.Supp.2d at 38.

Defendants have violated their statutory duty to produce records promptly or as soon as practicable after granting Plaintiff's FOIA request expedited treatment. Plaintiff's request

implicates a matter of the utmost urgency, where disclosing information obtained through a

FOIA request will concretely impact thousands of individuals in immigration detention centers.

For these reasons, Plaintiff can demonstrate a likelihood of success on the merits of its request

that the Court find Defendants have failed to comply with their statutory duty to timely produce

records and order production of responsive records within 30 days of any order by the Court, or

by a date that the Court deems appropriate.

## II.     **Plaintiff Faces Irreparable Harm.**

Plaintiff can make the required showing of irreparable harm for an injunction ordering

the prompt release of records to issue. Here, delay in the release of information will interfere

with Plaintiff's efforts to inform and impact a rapidly evolving discussion of national

consequence involving a governmental agency – the manner in which ICE is safeguarding the

rights of individuals held in immigration detention facilities during a deadly pandemic. *United*

*States Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749,

773 (1989) ("Official information that sheds light on an agency's performance of its statutory

duties falls squarely within [FOIA's] purpose."); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S.

214, 242 (1978) "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the

functioning of a democratic society…."). Moreover, ICE's decades-old track record for resisting

oversight of its immigration detention system and meaningful scrutiny of conditions at its

facilities elevates the urgency of Plaintiff's request. Creighton Decl. ¶21-22. Defendant ICE's

resistance to transparency has drawn public criticism, given the nature of deaths of individuals in

its custody and other systemic deficiencies throughout its unwieldy immigration detention

system. FOIA was designed to facilitate scrutiny in this scenario. *See EPA v. Mink*, 410 U.S. 73,

80 (1973), *superseded by statute*, Freedom of Information Act, Pub. L. No. 93-502, 88 Stat. 1561

(1974) (FOIA "seeks to permit access to official information long shielded unnecessarily from

14

public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands.").

Importantly, because of the nature of Plaintiff's request and Defendant ICE's track record, time is of the essence, and for the public to act, it must have access to timely information. The value of the information that Plaintiff endeavors to place in the public's hands in order to safeguard the rights of detained individuals and ensure government transparency is dependent on its prompt production. *Washington Post*, 459 F.Supp. at 74 (recognizing the "diminutive value of untimely disclosure" and that 'stale information is of little value.'") (citing *Payne Enters.*, 837 F.2d at 494). Delayed release of records in this instance lessens the value of the information because it can in turn prevent the public from effectively acting. This constitutes a clear, irreparable injury to Plaintiff. *American Oversight,* 414 F.Supp.3d at 186; *see also Sai v. Transportation Security Administration*, 54 F.Supp.3d 5, 10 (D.D.C. 2014) ("To be sure, a movant's general interest in timely processing of FOIA requests may be sufficient to establish irreparable harm if the information sought is 'time-sensitive.'") (citations omitted); *EPIC*, 416 F.Supp.2d at 40 (the "loss" of the "value" of timely information "constitutes a cognizable harm").

The urgency inherent in Plaintiff's request is undeniable, particularly because the consequences of delay in public oversight can have tragic, irreversible consequences. Already, one individual has passed away as a result of COVID 19 while in ICE custody and scrutiny is warranted to prevent further, potentially unnecessary, deaths, among other consequences for detained immigrants. *Protect Democracy Project, Inc.*, 263 F.Supp.3d at 301 (finding harm in delayed information regarding legality of airstrikes over Syria because "[m]ilitary strikes cannot be undone.").  To this end, Plaintiff has identified gaps in information currently unknown to the

public that is vital to ensuring accountability over ICE's response to the COVID-19 outbreak. Dkt. 1 at ¶19. For example, it is not clear what testing procedures ICE has instituted in its facilities. ICE also has not released information about what steps it is taking to safely house symptomatic individuals. *Id*. In addition, ICE has not shared concrete, reliable data with the public to reassure it of ICE's attempts to stem the spread of COVID-19 and treat detained individuals. Data that would shed light, for example, on the number of medical housing rooms available in ICE facilities, the number of detained individuals who have been placed in solitary confinement for COVID-19-related reasons, and the number of individuals who have been transferred to an external hospital center or urgent care facility to treat COVID-19. *Id* at ¶21. ICE's guidance for release of detained individuals also is unclear. *Id*. at ¶22.

To address this critical information gap, Plaintiff intends to widely disseminate the records obtained in this FOIA request to influence public action and contribute to the ongoing conversation over the adequacy of Defendant ICE's response to the COVID-19 pandemic. *See e.g. Seavey v. Department of Justice*, 266 F.Supp.3d at 248 (ordering production by date certain on summary judgment because information sought exposed "'serious gaps in the public's understanding of the role of the FBI and the U.S. government...'"). If Defendants do not promptly release records responsive to the FOIA request, members of the public will be hindered in their ability to hold DHS and ICE accountable for any failures to take adequate steps to release at-risk individuals or to keep detained individuals safe. *EPIC*, 416 F.Supp.2d at 41 ("Beyond losing its right to expedited processing, [plaintiff] will also be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program"). Plaintiff will thus be thwarted in its mission to arm the public with the information necessary to propel action

and accountability. *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017) ("District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate.") (citations omitted).

This case exemplifies the harm that can result to a requester when the release of relevant, consequential information is delayed. The Court should find that Plaintiff has made a showing of irreparable harm.

**III.    The Balance of Equities Favors A Preliminary Injunction**

Plaintiff can also demonstrate that the balance of equities mitigates in favor of injunctive relief in this case. In the first instance, neither Defendant will be harmed or burdened by "…a requirement that [it] comply with the law," that is, effectuate Plaintiff's right to the prompt release of responsive records. *EPIC,* 416 F.Supp.2d at 41. Defendant DHS has already granted Plaintiff's request for expedited processing, conceding that Plaintiff's request meets the criteria for such treatment under the statute. *See* Dkt. 1, Ex. C, 5 U.S.C. § 552(a)(E)(i); 6 C.F.R. § 6 C.F.R. § 5.5(e). Defendants were thus required to produce responsive records "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). Defendants also have exceeded the timeframe to release responsive records "promptly" under the FOIA's normal processing scheme. 5 U.S.C. § 522(a)(3)(A). An order from the Court that results in Defendants' compliance with their statutory obligations will thus not burden Defendants. Injunctive relief in this case merely effectuates what Defendants have already conceded to Plaintiff – expedited treatment.

Nor will granting injunctive relief in Plaintiff's case unduly burden or harm other FOIA requesters. As noted, Defendants have granted Plaintiff's request to expedite its FOIA response, moving Plaintiff's request to the front of the FOIA processing queue. *Protect Democracy Project, Inc.*, 263 F.Supp.3d at 296. Other FOIA requesters thus will not be harmed by a preliminary

injunction that adheres to the FOIA processing scheme already in place. *American Oversight*, 414 F.Supp.3d at 187 (where information sought would "directly inform" the debate and investigation implicating presidential impeachment inquiry, "[t]he public's interest in disclosure of responsive, non-exempt records is therefore high and outweighs any harm to other FOIA requesters that might result from a temporary diversion of the State Department's FOIA resources to accelerate processing of this request"); *Washington Post*, 459 F.Supp. at 76 ("pursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests.").

## IV.     The Public Interest Favors an Injunction

Plaintiff also can demonstrate that an order by the Court in this case to produce responsive records will serve the public interest. First and foremost, as Plaintiff has already noted, one of FOIA's key functions is to facilitate accountability over government agencies. Courts have long recognized the important function that FOIA plays in empowering the public with the necessary information to scrutinize governmental activity. *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 171–72 (2004) ("FOIA is "a means for citizens to know 'what their Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy.").

Here, the information that Plaintiff seeks will help inform on-the-ground efforts of attorneys and advocates working to preserve the health and due process rights of individuals in Defendant ICE's custody. Relevant information sought in the FOIA request includes criteria for release of individuals at risk for contacting COVID-19, information regarding medical treatment and housing, as well as sanitization procedures and communication protocols. This is information that Defendant ICE has not made available to the public.

Moreover, as noted in the previous section, holding Defendants accountable for their statutory obligations under FOIA serves the public interest. *See Jacksonville Port Auth. v. Adams.,* 556 F.2d 52, 59 (D.C.Cir.1977) (noting "an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate"). Requiring that Defendants meet their statutory obligations with respect to Plaintiff's request will help ensure the FOIA process functions for all requesters. Plaintiff can thus also make a showing that injunctive relief will benefit the public interest.

## CONCLUSION

For the reasons outlined above, Plaintiff has established that it meets the criteria for injunctive relief. Plaintiff therefore respectfully asks the Court to order that Defendants ICE and DHS produce responsive records to its FOIA request within 30 days of any order by the Court, or by a date that the Court deems appropriate.

Dated: May 12, 2020                    Respectfully submitted,

                                       */s/ Claudia Valenzuela*
                                       Claudia Valenzuela (D.C. Bar No. IL0056)
                                       Emily Creighton (D.C. Bar No. 1009922)
                                       AMERICAN IMMIGRATION COUNCIL
                                       1331 G St. NW, Suite 200
                                       Washington, DC 20005
                                       (202) 507-7540/7514
                                       (202) 742-5619 (fax)
                                       cvalenzuela@immcouncil.org
                                       ecreighton@immcouncil.org

                                       *Attorneys for Plaintiff*